[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties were married in Roslyn, New York, on October 17, 1982. They have two children, Lisa, who has reached her majority and is currently a college student, and Laura, born June 9, 1989, who resides primarily with the plaintiff wife ("wife") in the family home in Weston, Connecticut. The defendant husband ("husband"), however, testified that he has played a significant role in the child-rearing, and that both children spend significant time with him. He currently pays the college expenses for the older child. The parties have been living separate and apart since May 1999. The husband has provided virtually all of the family support since the separation. The case was initially filed as an action for legal separation, however, both parties now seek a dissolution of marriage as is evidenced by their Stipulation dated May 16, 2002, as on file with the court. Following an unsuccessful mediation, the case was tried to the court over the course of three days.
The husband is 50 years old and in good health. He is a practicing physician and a partner in a New York medical group called Children's Physicians of Westchester, LLC (his job includes some management responsibilities), serves as the Director of Pediatrics at Sound Shore Medical Center, and receives a stipend of $2,000.00 per month from Danbury Hospital. In addition, he has teaching and writing responsibilities. His specialty is pediatric gastroenterology, and his consulting practice covers a wide area of lower Fairfield County from Danbury to Greenwich. Sixty to seventy hours is a typical workweek. His income from Sound Shore Medical Center has been substantially reduced due to his cut back of duties. His resume is quite impressive, having received his undergraduate degree from Cornell University, a Masters Degree in Nutrition from Columbia University, and his medical degree from SUNY at Buffalo. A residency in pediatrics followed, at Yale from 1978 to 1981, as well as a fellowship at Children's Hospital in Philadelphia in 1983. At the time the parties first met in April 1982, he was an Assistant Professor of Medicine at Cornell. For a short time following their marriage, he worked at Norwalk Hospital. Later, in 1993, the family CT Page 12855 moved to Atlanta, Georgia, where he accepted a position at Emory University. This did not work out, and the family moved back to Connecticut the following year. He has been rewarded for his hard work with significant degree of financial success. Between 1995 and 2001 he has reported gross income from a low of $345,000 in 1995 to a high of $620,000 in 2000. He currently receives approximately $400,000 per annum from all sources.
The wife is 53 years old and has testified to having a variety of ailments ranging from a congenital heart problem (for which she had surgery at the age of six), to PAT and tachycardia. At one point she was seeing a psychiatrist for depression which was first diagnosed in 1998. She no longer sees the psychiatrist, since it "was not helping at that time, " and she no longer takes the medication, indicating that "she feels better today than 1999." In addition, she testified that she had some gynecological problems, including fibroids. She also testified that her heart condition is related to the amount of stress she is subjected to, but that it can be ameliorated by surgery. She has chosen not to take this step, indicating that her physician has not recommended it at this time. The incidents of PAT have been frequent, and on four occasions during the past five years she has been taken to the hospital. She had one incident of a trial fibrillation in April 1999. Her medication is Inderol, for which her husband has written prescription for the past eleven years, but which she says affects her ability to concentrate and remember things. Both of her pregnancies were accompanied by complications. She avoids strenuous or sudden bursts of activity and stress, and uses the treadmill at the YMCA without any incline.
She, too, is a medical doctor. Her own resume is as exceptional as her husband's. She graduated from Barnard College in 1969 and received her medical degree from SUNY Downstate Medical Center. This was followed by a residency at Mount Sinai in internal medicine and a two-year fellowship in Nephrology. Both prior to and following her pregnancies, her employment has ranged from an assistant professorship at New York/Cornell Medical School where she earned $60,000 to $65,000 per year, as a faculty member of New York Medical College from 1987 to 1992, as the Medical Director for OSHA compliance at General Electric Company (part time), and to Cologne General Reinsurance as a medical underwriter. She testified that she was fired from the latter following a four to five month medical leave, during which she received IV therapy for a difficult pregnancy. Her medical license has lapsed, and, while she could be retested and certified, in her words, "medicine has passed her by." In 1998, she applied for a residency in psychiatry, however, she "decided that it was too much." She even tried a brief stint in law school before dropping out. She has been an involved mother of two, as well as an active CT Page 12856 participant in numerous charitable and community organizations. She testified that she does laundry, cooks, shops, gardens, and housecleaning, with help one day per week. In her words, the child care is "very fulfilling, " and she said that both she and her husband agreed that it "is in the best interest of the children" that she be a full time mother. The court finds her testimony on this score to be very credible. In short, the court finds that given her education and experience, as her child-rearing responsibilities wind down, and given a reasonable period of time to re-enter the workforce, she has a substantial earning capacity and an ability to eventually support herself. The court is well aware of numerous persons with similar (or more serious ) limitations who are productive members of our society. She even testified that "wants to," even "looks forward to returning to work." The court is unconvinced that lifetime alimony would be appropriate.
The principal asset of the parties is the marital home in Weston, title to which was transferred from joint names to the wife's name in 1995. It is a nearly six-thousand-square-foot dwelling located at 62 Pheasant Hill Lane. This home was their second, the first being purchased in May 1983. As to the first home, in addition to a mortgage, the purchase was aided by gifts and loans from the wife's parents and other relatives of about $40,000, half of which was paid back. This home was sold in 1992, and they used the proceeds to purchase a lot in Weston and to construct their home. This project has been rife with problems, some of which persist today and will require the expenditure of substantial monies to remedy. Nevertheless, it is the principal home of the minor child, and the husband's income and the existence other family assets do not lead the court to the conclusion that the house should be sold immediately, absent an agreement on the part of the husband and wife. The appraisal reports considered by the court places the fair market value between $1,200,000 and $1,375,000. There is a first mortgage with a current balance of $459,000, leaving an equity of $741,000. There is a dispute as to whether or not the wife contributed to or loaned $44,000 to the project from her inherited funds. However, given the husband's disproportionately large financial contribution to the family throughout the marriage, the court finds that this sum, however characterized, along with the initial contributions to the first home by the wife's relatives, makes it substantially a wash. Other marital assets include, jewelry, home furnishings (including a number of reproduction oriental rugs); substantial retirement assets; and investment accounts. The automobiles are leased. In addition, the wife has approximately $300,000 in inherited funds which she has maintained separately.
The court heard no credible testimony regarding fault in regard to the breakdown of the marriage in accordance with a Stipulation of the parties CT Page 12857 dated May 16, 2002. Aside from the question of the wife's health and her employability, of which the court heard considerable testimony, the only other controversies involved finances. For her part, the wife claims that the husband removed about $140,000 of her funds without her knowledge or approval and used them to pay bills. He has since replaced these monies dollar for dollar, together with an amount calculated to make up for her lost interest. For his part, the husband claims that shortly before trial the wife removed monies from their Brandywine Fund and used some to pay her attorney's fees and a Bat Mitzvah. In addition, the wife has failed to report her one-half share of an $80,000 account with her brother. In the overall context of this case, the court accords only minimum significance to these actions taken as the marriage came unraveled, given the attendant frustration, animosity, and uncertainty in matrimonial litigation.
 FINDINGS
The Court, having heard the testimony of both parties, and having considered the evidence presented at hearing, as well as the factors enumerated in General Statutes §§ 46b-56, 46b-81, 46b-82, 46b-84, and46b-215a, including the Child Support and Arrearage Guidelines Regulations, hereby makes the following findings:
1. That it has jurisdiction.
2. That the allegations of the complaint are proven and true.
3. That the marriage of the parties has broken down irretrievably, and that pursuant to the agreement of the parties, no evidence of fault was introduced at trial, and therefore the court makes no finding of fault.
4. That both parties have made significant financial and non-financial contributions to the acquisition, maintenance, and preservation of marital assets, as well as the rearing of the two children.
5. That the evidence discloses that the wife suffers from congenital heart conditions for which she is taking medication; that she has some limitations on her ability to practice medicine on a full-time basis; that she continues her role as homemaker and mother as well as volunteer commitments in her community; that the evidence discloses that she has, by virtue of her age, education, and experience, a substantial earning capacity and the ability to contribute to her own support; that it is equitable and appropriate that the court take this factor into consideration in entering its orders regarding alimony and support; and that it is equitable and appropriate that time-limited alimony be CT Page 12858 awarded.
6. That during the marriage, the wife received inheritances from her parents and an uncle totaling approximately $300,000; that, with the exception of a payment toward the construction of the marital residence in Weston, Connecticut in the amount of $45,000, which the wife continues to characterize as a loan, these funds have been maintained by the wife as separate and distinct from other assets; that these funds are not a marital assets, however, the husband has been the principal support for the family throughout the marriage, which support has contributed to the maintenance and appreciation of this asset; and that it is equitable and appropriate for the court to take this into consideration in the division of marital assets.
7. That both parties have requested that the court enter an unallocated alimony order; that the court has declined to do so; and that the court in the exercise of its equitable powers has entered appropriate financial orders under all the circumstances. Porter v. Porter, 61 Conn. App. 791,797-98 (2001).
8. That title to the real property known as 62 Pheasant Hill Lane, Weston, Connecticut, is currently in the name of the wife; that the parties have stipulated and agreed, that in order to maximize the tax advantages upon sale, that at the time of judgment, the title to same should be held in both names; and that the court may, but is not obligated to take into consideration the federal tax consequences of its financial award. Rolla v. Rolla, 48 Conn. App. 732, 745-747 (1998).
9. That the court having considered the evidence, including the appraisal reports, finds the fair market value has been negatively impacted by the condition of the property; and that the fair market value is $1,200,000.
10. That the combined net weekly income of the parties is in excess of the maximum Child Support Guidelines amount; that presumptive basic child support is $383.00 per week; and that the husband's share is $370.00; and that it would be inequitable to apply the presumptive basic amount.
 ORDER
IT IS HEREBY ORDERED THAT:
1. The marriage of the parties is hereby dissolved, and they are each hereby declared to be single and unmarried. CT Page 12859
2. Commencing November 1, 2002, and monthly thereafter, the husband shall pay to the wife the sum of $10,000.00 as and for periodic alimony, until the death of either party, the remarriage of the wife, or October 31, 2007. Thereafter, commencing November 1, 2007, and monthly thereafter, the husband shall pay to the wife the sum of $7,500.00 as and for periodic alimony, until the death of either party, the remarriage of the wife, or October 31, 2012, whichever shall sooner occur. Pursuant to General Statutes § 46b-86 (a) the term of said alimony shall be nonmodifiable. Provided further, that the wife shall be entitled to earn up to $35,000 per annum from employment on a full or part time basis before the husband can seek a modification based solely on her earnings.
3. Commencing November 1, 2002, and monthly thereafter, the husband shall pay to the wife the sum of $2,500.00 as and for child support, until such time as the child shall reach the age of eighteen years or shall be otherwise emancipated. The foregoing notwithstanding, if the child shall turn eighteen years old and is still in high school, then, in that event, the child support shall continue until the first day of next month following graduation from high school or their nineteenth birthday, whichever shall sooner occur, pursuant to General Statutes § 46b-84 (b).
4. The husband and wife shall have joint legal custody of the minor child, Laura Glassman, born June 9, 1989. The primary residence of the minor child shall be with the wife, subject to the reasonable, liberal and flexible visitation rights of the husband. Both parties shall be entitled to two consecutive weeks' visitation with the child during the summer school recess. Holidays shall be equally divided between the parties and shall alternate from year to year. The parties shall consult with one another concerning all major issues involving the minor child, including but not limited to, health, education, and religious affiliation and training. In the event that parties are unable to agree upon any issue regarding custody and/or appropriate visitation, they shall first bring the matter to the Family Relations Office for mediation prior to a determination by the Court.
5. The wife shall have exclusive possession of the jointly owned real estate located at 62 Pheasant Hill Lane, Weston, Connecticut, subject to any existing indebtedness, and she shall be responsible for the payment of all mortgages, liens, taxes, and insurance, and shall indemnify and hold the husband harmless from any further liability thereunder. Within two (2) weeks from the date of this Memorandum of Decision, at her sole expense, the wife shall by Quitclaim Deed convey title to said real property to herself and her husband in equal shares, as tenants in common, and she shall promptly record said deed with the Town Clerk of CT Page 12860 Weston, also at her sole expense. Unless they shall otherwise agree, the parties shall list same for sale no later than April 1, 2007, with a mutually acceptable broker who is a member of the Multiple Listing Service or other similar organization, familiar with real estate values in the Weston area, at a mutually agreed upon listing price. If the parties are unable to agree upon a listing price, each shall choose a broker who, in turn shall pick a third broker, and the listing price shall be the average of all three brokers. Unless the parties shall otherwise agree, they shall accept any bona fide offer without unusual conditions, which is within 4% of the listing price. Upon sale of the property, from the proceeds shall be paid the customary and ordinary costs associated with a sale of real estate, including broker and attorney fees, conveyance taxes, fix-up expenses, and any mortgages and liens. After the payment of these sums, the net proceeds shall be divided 50% to the wife and 50% to the husband.
While she occupies same, the wife shall have the sole responsibility for repairs costing $250 or less. Both parties shall share the cost of any maintenance, repairs, or replacements in excess of $250 in the same proportion as their share of the net proceeds. Either party may advance the full cost of same and an adjustment shall be made at time of sale or transfer. Neither party shall further encumber the property nor draw on any home equity line without the agreement of the other. The Court shall retain jurisdiction with regard to any conflicts arising out of this issue.
6. Personal property shall be divided as follows:
 A. The child's furniture shall remain in the wife's residence.
 B. The home furnishings (other than the child's furniture) shall be divided as nearly equally as possible. In the event that the parties are unable to agree upon a division, the issue is hereby referred to Family Relations for resolution and recommendation.
C. Each party shall be entitled to keep the automobile which they are currently driving (whether owned or leased) free and clear of any claims by the other, and each party shall cooperate with the other regarding the execution of any documentation necessary to transfer and/or register same. Each party shall be responsible CT Page 12861 for the lease payments on their vehicle, and shall indemnify and hold the other harmless from any further liability thereon.
 D. Except as otherwise set forth herein, each party shall be entitled to keep their respective savings, checking, certificates of deposit, money market accounts, and investment accounts, free and clear of any claims by the other.
 E. The following items shall be divided equally by the parties:
1. Fleet joint checking
2. Vanguard Windsor Fund II
3. Vanguard Growth Fund
4. Level 3 Fund
5. Papp America Fund
6. T. Rowe Price New Horizon Fund
7. Janus Fund
8. Charles Schwab/MAS Fund
9. Charles Schwab #3703-7715
10. Vanguard MgD Fund
11. Strong Midcap Fund
12. Fidelity Growth Fund
13. Putnam Hartford Annuity
 F. The following items shall belong to the husband free and clear of any claims by the wife:
1. Cash values of the Aetna and Guardian life insurance policies. CT Page 12862
2. Vector Medical Technologies Stock
3. Security deposit
4. Federal and state income tax credits
 5. Interest in Children's Physicians of Westchester, LLC
 G. The following items shall belong to the wife free and clear of any claims by the husband:
1. Her jewelry.
 2. Series EE U.S. Savings Bonds, including joint $100.00 bond.
 3. The balance of her inherited funds and assets currently in her name.
4. The balance of the Brandywine Fund.
7. The retirement assets of the parties shall be divided as follows:
A. Effective as of October 1, 2002, the then balance of the husband's Keogh Plan through TIAA/CREF ("Plan"), together with any interest and/or additions accrued thereon as of the actual date of distribution, shall be divided by means of a Qualified Domestic Relations Order ("QDRO") which shall be prepared by the attorney for the husband, 44% to the husband and 56% to the wife. The wife and her attorney shall be entitled to any and all information regarding the Plan necessary to the preparation and filing of the QDRO, including, but not limited to prior and current balances and prior account activity. No withdrawals, distributions, or transfers shall be made regarding the Plan except as consistent with this order. The Court shall retain jurisdiction to deal with any issues which may arise with regard to the preparation and filing of the QDRO and the division of the Plan.
B. Effective as of October 1, 2002, the then balance CT Page 12863 of the husband's Keogh Plan through Galaxy/Fleet ("Plan"), together with any interest and/or additions accrued thereon as of the actual date of distribution, shall be divided by means of a Qualified Domestic Relations Order ("QDRO") which shall be prepared by the attorney for the husband, 60% to the husband and 40% to the wife. The wife and her attorney shall be entitled to any and all information regarding the Plan necessary to the preparation and filing of the QDRO, including, but not limited to prior and current balances and prior account activity. No withdrawals, distributions, or transfers shall be made regarding the Plan except as consistent with this order. The Court shall retain jurisdiction to deal with any issues which may arise with regard to the preparation and filing of the QDRO and the division of the Plan.
 C. Except as set forth above, the husband and wife shall retain their respective retirement accounts free and clear of any claims by the other. Bach party shall cooperate with the other to execute whatever documentation is necessary to effectuate the provisions of this article.
8. The husband shall maintain and pay for health insurance for the minor child so long as he shall be obligated to pay child support. Unreimbursed medical, dental, orthodontic, optical, pharmaceutical, psychiatric, and psychological expenses for the minor child shall be divided by the parties, 50% by the husband and 50% by the wife. The provisions of General Statutes. § 46b-84 (e) shall apply.
9. The husband shall promptly notify his employer as to the change of marital status and shall cooperate with the wife in obtaining continuation health insurance coverage as provided by state and federal law. The wife shall be responsible for the payment of any premiums due for such coverage.
10. The husband shall maintain a portion of his existing life insurance in the face amount of $1,000,000, and shall name the wife and minor child as equal beneficiaries thereof for so long as he has an obligation to pay alimony and child support under the terms of this decree. In the event that alimony shall terminate and a child support obligation remains, the husband shall maintain the sum of $500,000 for the benefit of the minor CT Page 12864 child so long as he has an obligation to pay child support. The court finds this obligation to be in the nature of support.
11. Except as otherwise set forth herein, the parties shall each be responsible for the debts as shown on their respective financial affidavits, and they shall indemnify and hold each other harmless from any further liability thereon.
12. The wife shall be entitled to claim the personal exemption for the minor child commencing with the tax year 2002 and thereafter.
13. Each party shall be responsible for their respective attorney's fees and costs incurred in connection with this action.
14. The Court hereby orders an Immediate Wage Withholding Order pursuant to General Statutes § 52-362 (b) in order to secure the payment of the alimony and child support orders.
THE COURT
SHAY, J. CT Page 12865